NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-3179

MICHAEL L. WOODSON,

Petitioner,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

Michael L. Woodson, of Hampton, Georgia, pro se.

Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for respondent. With him on the brief were Jeffrey S. Bucholtz, Acting Assistant Attorney General; Jeanne E. Davidson, Director; and Steven J. Gillingham, Assistant Director.

Appealed from: Merit Systems Protection Board

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-3179

MICHAEL L. WOODSON,

Petitioner,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

Petition for review of the Merit Systems Protection Board in AT0752070532-I-1.

_____

DECIDED:  June 6, 2008

_____

Before MAYER, SCHALL, and LINN, Circuit Judges.

PER CURIAM.

DECISION

Michael L. Woodson petitions for review of the final decision of the Merit Systems Protection Board ("Board") that sustained the action of the Department of Homeland Security ("DHS") removing him from his position based upon two charges: (1) failure to follow procedures that had been established for his position as an Agriculture Technician for the U.S. Customs and Border Patrol ("CBP") and (2) unprofessional conduct.  Woodson v. Dep't of Homeland Sec., No. AT-0752-07-0532-I-1 (M.S.P.B. Jan. 7, 2008) ("Final Decision").  We affirm.

DISCUSSION

I.

Prior to his removal on March 26, 2007, Mr. Woodson was employed as an Agriculture Technician with CBP in Atlanta, Georgia. He was involved in screening baggage carried by international airline passengers arriving in the United States for agricultural products that are prohibited from entering the country. When passengers arrive from abroad, they complete a declaration form that asks whether they are carrying various agricultural items—e.g., fruits, snails, food, etc. If they are suspected of carrying agricultural products, they will be referred to "Agriculture Secondary Inspection." When a passenger is referred to secondary inspection, a large "A" is written on the declaration in blue ink.

At secondary inspection, there are three CBP employees working on each x-ray belt. First, there is an Agriculture Technician who stands in front of the x-ray machine. This first technician is responsible for looking at passengers' declarations, asking the passengers questions, and asking them to place their bags on the x-ray machine. Second, there is an Agriculture Technician who operates the x-ray machine itself. Finally, at the back of the x-ray machine there is an Agriculture Technician who questions passengers, opens bags, and confiscates prohibited items.

II.

Mr. Woodson was removed from his position as an Agriculture Technician based upon two charges: (1) failure to follow procedures and (2) unprofessional conduct. Following his removal, he appealed to the Board.

The charge of failure to follow procedures was based upon an incident that occurred on May 18, 2006, while Mr. Woodson was working at the front of an x-ray machine in the Atlanta airport. The relevant facts are largely undisputed. While working at the front of the x-ray machine on that date, Mr. Woodson encountered two female passengers who just arrived from Romania. Their declaration forms had been marked with large "A's," indicating that they were referred for secondary inspection. In addition, one of the forms contained the words "bamboo sticks" written in large print in blue marker and circled. Contrary to established procedure, Mr. Woodson did not examine their declarations, ask them a single agricultural question, or have them place their bags on the x-ray machine. Instead, he told them that they were "good to go" and instructed them to go down the side of the x-ray machine toward the exit of the secondary inspection area. His supervisor, Pat Jean, witnessed these events and intervened, instructing the two passengers to place their bags on the x-ray conveyor belt. Ultimately, the bamboo sticks were excluded from entry into the United States.

At the hearing before the administrative judge ("AJ") to whom his appeal was assigned, Mr. Woodson's explanation for his conduct was twofold. First, he disagreed with CBP's statement of the proper screening procedures. He argued that he possessed the authority to determine—when a passenger's declaration was marked for secondary inspection—whether to require the passenger to place his bags on the x-ray belt, send him down the side for further inspection, or send him to the exit. According to Mr. Woodson, this longstanding practice was carried over from his employment with the United States Department of Agriculture ("USDA"), Animal Plant Health and Inspection Service ("APHIS"), which had responsibility for agricultural item screening prior to the

creation of DHS and CBP. Second, he contended that he recognized the two passengers arriving from Romania as government employees and properly extended them "courtesy of the port," which allowed them to bypass x-ray.

Based upon evidence that included statements from Mr. Woodson as well as several CBP officials and employees, the AJ rejected both of these arguments. Woodson v. Dep't of Homeland Sec., No. AT-0752-07-0532-I-1 (M.S.P.B. Jul. 23, 2007) ("Initial Decision"). First, the AJ determined that Mr. Woodson possessed no discretion under CPB procedures to exempt passengers from agricultural inspection and that Mr. Woodson had been informed of this on at least three prior occasions. He had been personally confronted twice before about violating the same procedure, and he had received an email that was sent to numerous CBP employees stating that all passengers referred for secondary inspection must undergo the x-ray procedure. In addition, the AJ determined that neither of the passengers arriving from Romania was a government employee and that, in any event, CBP procedures (of which Mr. Woodson was aware) did not exempt government employees from having their bags undergo x-ray. At most, "courtesy of the port" meant treating high-ranking officials and diplomats in a different manner; it did not exempt those persons from the secondary inspection procedures. Thus, the AJ sustained the first charge against Mr. Woodson.

III.

The agency's second charge of unprofessional conduct was based upon two incidents that also occurred on May 18, 2006. The first incident arose from a request that another supervisor, David Storch, made of Mr. Woodson. Contraband seized in the secondary inspection area is taken to a grinding room near the x-ray belts for

destruction. Generally, the employee who is working the x-ray machine is responsible for destroying any contraband seized from baggage passing through that machine. Prior to the incident, only one x-ray belt was open in the secondary inspection. However, due to the volume of passengers that was coming through secondary inspection, Mr. Storch decided to temporarily open a second belt. He asked various employees to operate the second belt, but no one person was technically responsible for any given position. When the volume of passengers decreased and the second belt was closed, Mr. Storch requested that Mr. Woodson destroy the contraband that was seized on the second belt when Mr. Woodson went to destroy his own contraband. Mr. Woodson refused to destroy the additional contraband, stating that it was not his contraband. Mr. Storch then pushed the additional contraband into the grinding room. Apparently, Mr. Woodson ultimately did destroy the additional contraband after destroying his own.

The second incident of unprofessional conduct occurred at a meeting that Mr. Woodson attended at the end of his shift. Present at the meeting were Ms. Jean, Mr. Storch, and Yvonne Williams, Mr. Woodson's union representative. After a discussion about the two passengers arriving from Romania, Mr. Woodson was confronted by supervisor Pat Jean about a cellular telephone case that was attached to his belt. Mr. Woodson had been previously advised that the possession of cellular telephones was not permitted in his work area. Upon noticing that Mr. Woodson was wearing a cellular telephone case on his belt, Ms. Jean questioned him about it. In fact, the case did not contain a cellular telephone; it contained a pack of cigarettes. In response to Ms.

Jean's question, Mr. Woodson abruptly pulled the box of cigarettes from the case and threw it across the floor in her direction.

Next, Mr. Storch began to discuss the contraband incident from earlier that day. Mr. Woodson stood up and escalated the conversation, asking Mr. Storch if he thought he was better than him and exclaimed that he was "not going to be anybody's flunky." When asked to sit down, he told Mr. Storch that he would not sit down and that Mr. Storch himself should have a seat. Ultimately, Ms. Jean and Ms. Williams intervened.

Before the AJ, Mr. Woodson provided various justifications for his conduct. He stated that he was angry and frustrated about Ms. Jean's cellular phone question, which was accusatory and demeaning. He stated that he did not interpret Mr. Storch's request as an order to destroy the additional contraband, that it was not his job responsibility to destroy someone else's contraband, and that he ultimately did destroy the contraband. Finally, he factually contested what happened in the course of his exchange with Mr. Storch at the meeting, and he argued that his behavior was provoked by Mr. Storch's towering over him and trying to intimidate him.

Based upon the statements of Mr. Woodson, Ms. Jean, Mr. Storch, and Ms. Williams, the AJ sustained the agency's charge of unprofessional conduct. The AJ determined that even under the facts that were uncontested, Mr. Woodson's actions on May 18, 2006, were unprofessional, inappropriately challenging to authority, and "lacked the appropriate decorum reasonably expected during any interchange between a supervisor and an employee." Initial Decision at 16.

V.

The AJ also denied Mr. Woodson's affirmative defense that his removal was in retaliation for protected Equal Employment Opportunity ("EEO") activity. Specifically, Mr. Woodson argued that he was removed for his (1) assisting others in filing and processing EEO claims and (2) email to the officials responsible for his removal concerning "discrimination against his wife by African Americans." The AJ determined that, even assuming that Mr. Woodson engaged in protected activity and that the officials responsible for removing him were aware of that activity, Mr. Woodson had not established a genuine nexus between any retaliation and his removal. Instead, the AJ concluded that it was quite clear that the basis for his removal was his inappropriate conduct toward his supervisors and his failure to follow inspection procedures.

Finally, the AJ determined that the agency had considered factors set forth in Douglas v. Veterans Administration, 5 M.S.P.R. 280, 299 (1981), in determining the appropriate penalty, and that the penalty of removal was within the bounds of reasonableness. The AJ specifically concluded that Mr. Woodson's two prior 7-day suspensions (for making threatening statements to coworkers and supervisors, absence without leave, and inappropriate conduct), blatant disregard for procedures, and lack of any remorse whatsoever "militates against a mitigation of the agency's selected penalty." Initial Decision at 21. The Initial Decision became the final decision of the Board when the Board denied Mr. Woodson's petition for review. Final Decision. We have jurisdiction over Mr. Woodson's appeal pursuant to 28 U.S.C. § 1295(a)(9).

IV.

Our jurisdiction to review Board decisions is limited by statute. We must affirm a Board decision unless we find that it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Haebe v. Dep't of Justice, 288 F.3d 1288, 1298 (Fed. Cir. 2002) (quoting Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)). "The question before us is not how the court would rule upon a de novo appraisal of the facts of the case, but whether the administrative determination is supported by substantial evidence in the record as a whole." Id.

We have considered the arguments raised by Mr. Woodson, including those arguments apparently incorporated by reference from his petition for Board review. However, we find that the Board's decision is supported by substantial evidence and is otherwise in accordance with law. On appeal, Mr. Woodson argues against the charges underlying his removal by essentially restating the arguments he made before the Board, which are discussed above and which he contends show that his conduct on May 18, 2006, was justified. Relying upon statements and testimony from various CBP employees and officials, the AJ determined that a number of Mr. Woodson's factual contentions were not credible. For the most part, however, the AJ sustained the charges against Mr. Woodson based upon the undisputed facts of the May 18th occurrences. Having reviewed the record and Mr. Woodson's arguments, we conclude

that substantial evidence supports the Board's decision to sustain the agency's charges that Mr. Woodson (1) failed to follow established procedures and (2) conducted himself unprofessionally. In particular, we find no basis for Mr. Woodson's theory on appeal that Ms. Jean and Mr. Storch conspired to plan the events of May 18, 2006, with designs to provoke Mr. Woodson's misconduct and facilitate his removal.

With respect to the affirmative defense of retaliation, substantial evidence supports the Board's conclusions (1) that Mr. Woodson failed, at a minimum, to establish a nexus between any retaliation and his removal and (2) that his removal, in fact, resulted directly from his conduct on May 18, 2006.

Finally, we do not agree with Mr. Woodson's argument that the Board committed legal error by ignoring his evidence relating to Douglas factor number 10: "potential for the employee's rehabilitation." He contends that he demonstrated his respect for authoritative rules in three ways: (1) he properly applied the inspection procedures as he understood them, (2) he became frustrated when CBP did not enforce its rule requiring employees to destroy their own contraband, and (3) he substituted cigarettes for his cellular telephone within the case he wore on his belt. Whatever minimal value this evidence has in showing Mr. Woodson's potential for rehabilitation, substantial evidence supports the AJ's conclusion that, because of his two prior suspensions and his complete lack of remorse with respect to his conduct on May 18, 2006, Douglas factor number 10 weighs against mitigating the agency's selected penalty. Because the Board's decision is supported by substantial evidence and is otherwise in accordance with law, we affirm.